UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOEL BRITT, as father and personal
representative of the estate of his son,
JASON MICHAEL BRITT, deceased,

        Plaintiff,

vs.                                          Case No. 8:04-CV-1723-T-27MSS

GRADY JUDD, Sheriff of Pok County, Florida,
in his official capacity, and MICHAEL
BURDETTE, Deputy Sheriff, in his individual
capacity,

        Defendants.
_____/


## ORDER

    **BEFORE THE COURT** is Defendants' Motion for Summary Judgment (Dkt. 33), Plaintiff's Response in Opposition (Dkt. 36) and Defendants' Three Page Reply in Support of Motion for Summary Judgment (Dkt. 33).   Upon consideration, Defendants' Motion for Summary Judgment is DENIED.

    Plaintiff, as personal representative of Jason Britt's estate, initiated this action alleging Defendant Michael Burdette, acting as a deputy sheriff for Polk County, infringed upon Britt's Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983 by effecting "an unreasonable seizure of [Britt] in that the deadly force used was unreasonable and excessive." (Dkt. 9, p. 4).   Plaintiff alleges Sheriff Judd is vicariously liable for the negligent and reckless action of Burdette.

1

Burdette contends summary judgment is proper because he is entitled to qualified immunity. (Dkt. 25). Sheriff Judd contends Burdette was not negligent, arguing he justifiably and reasonably used deadly force under the circumstances and that therefore there is no basis to impose vicarious liability on Sheriff Judd in his official capacity. (Dkt. 33).

## Factual Background

On July 26, 2002, at approximately 6:50 A.M, Michael Burdette, a deputy with the Polk County Sheriff's Office, arrived at a mobile home located at 4448 Viola Road, Lakeland, Florida. (Burdette Aff., Ex. A, p. 2).[1] Burdette was part of a search warrant execution team there to serve a search warrant for methamphetamine. (Burdette Aff., Ex. A, p. 1). Members of the search warrant execution team attested that the lone suspect was the owner of the home's boyfriend, a Hispanic male named Nicholas Rivera, a/k/a "Cowboy". (Plaintiff's Index of Exhibits filed Non-Electronically (hereafter "P's Exs."), Ex. A, pp. 145, 152). Included within the search warrant was a shed located at the rear of the residence. (Burdette Aff., Ex. A, p. 2). The search warrant listed the shed as "possibly being a . . . storage or a living quarters." (Matheny Aff., Ex. A, p. 5). At the time of the search, Burdette was wearing a "tactical vest", which bore the sheriff's logo in bright yellow letters. (Burdette Aff., Ex. A, p. 7).

During the execution of the search warrant, Burdette and Deputy Kevin Matheny approached the shed located at the rear of the residence.[2] (Burdette Aff., Ex. A, p. 2). Consistent with standard procedure when executing a search warrant, both deputies had their weapons drawn. (Matheny Aff.,

---

[1] Burdette testified that it was not dark at the time of the search. (Burdette Aff., Ex. A, p. 8).

[2] Matheny, a deputy for the Polk County Sheriff's office, was the case agent assigned to the search. (Matheny Aff., Ex. A, p. 2).

2

Ex. A, p. 6). As they approached the door of the shed, both deputies announced "Sheriff's Office search warrant." (Burdette Aff., Ex. A, p. 3; Matheny Aff., Ex. A, p. 3; P's Exs., Ex. A, p. 141). According to Burdette, as he "went to go to reach for the handle [of the shed, he] announced Sheriff's Office search warrant and at [that] time the shed door kicked open and [Burdette] was confronted by a white male [Britt] who had a baseball bat in his hand." (Burdette Aff., Ex. A, p. 3). Burdette described the door as being "kicked open . . . like [he] was confronted . . ." (Burdette Aff., Ex. A, p. 5).

According to Burdette, Britt was holding the bat over his head with one hand. (Burdette Aff., Ex. A, p. 9). Matheny testified that Britt was holding an aluminum bat above his head with his right hand, "raised up above [Britt's] head in a . . . striking position." (Matheny Aff., Ex. A, pp. 3, 4). According to Burdette, he stepped back because Britt approached him in an "aggressive manner" and because Burdette was "fearful" and believed that Britt was "going to hit [him] with it." (Burdette Aff., Ex. A, pp. 3-4, 8). Burdette testified that Britt held the bat in a " . . . . swinging manner like if he was going to swing and hit [him] with it." (Burdette Aff., Ex. A, p. 5). According to Matheny, the door swung out towards them, Britt was "aggressively approaching" them, Burdette then "moved backward" and seconds later fired a single shot at Britt. (Matheny Aff., Ex. A, pp. 3, 6-7). Matheny testified that Britt did not say anything to the officers, but he believed Britt was going to attack Burdette. (Matheny Aff., Ex. A, p. 7). After being shot, Britt fell to the ground and died.

The only other officer to witness the shooting was Dan Pennel. Pennel attested that he saw Burdette "reaching for the door knob of the shed . . ., the door sw[ung] out, and . . . [he] herd (sic) [the officers] yell Sheriffs Office search warrant . . . [and] then saw [Burdette] step backward and fire one shot from his handgun that was pointed into the interior of the shed." (P's Exs., Ex. A, p.

3

141). When Pennel looked into the shed he saw a white male lying down "just inside the door way." (P's Exs., Ex. A, p. 142).

Reports from other members of the search warrant execution team who did not observe the shooting but observed Britt's body after the shooting, indicate that Britt was found lying face down inside the shed with his right arm extended over his head and a metal baseball bat lying approximately three to six inches from his hand. (P's Exs., Ex. A, pp. 153, 157-58). According to the reports, Britt's hand was still "cupped as if he were holding the bat." *Id.*

During the relevant time period, Mark Montford lived near the mobile home located at 4448 Viola Road, Lakeland, Florida. (Montford Aff., ¶ 3; Montford Depo., p. 13). On the morning the search was conducted, Montford was taking his twin children for a walk. (Montford Depo., pp. 8-9). Montford witnessed police officers approach the rear of the residence at 4448 Viola Road and yell something. The shed door then opened and Britt was standing in the doorway "holding a baseball bat in his right hand." (Montford Aff., ¶ 3). According to Montford, Britt's "arm was hanging down at his side . . . [t]he bat was hanging straight down beside his leg . . . [and] [i]t appeared to [Montford], that [Britt] had just woken up and was trying to figure out what was going on." (Montford Aff., ¶ 3; Montford Depo., p. 16). Montford explained that Britt "always looked like [he just woke up] . . . rough nights or whatever." (Montford Depo., p. 19).

According to Montford, the officers told him to drop the bat or to "freeze", Britt shifted his weight from side to side and "his hand moved." (Montford Depo, pp. 16-17, 22-23). According to Montford, Britt made a twisting motion with his hand. (Montford Depo., p. 39). Immediately after Britt shifted his weight and moved his hand, Burdette shot Britt. (Montford Depo., p. 49). According to Montford, Britt "did not make any move toward the officers nor did he ever raise the bat up away

4

from his leg . . . [or] make any type of threatening gesture."[3] (Montford Aff., ¶ 3; Montford Depo., p. 49).

## Applicable Standards

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004) *(internal citations omitted)*. "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24. Plaintiff's evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

---

[3] Shortly after the incident, Montford told police he had not witnessed the shooting. (Montford Aff., ¶ 4; Montford Depo., p. 26). According to Montford, he did not tell the officers what he had witnessed because he was "in fear of [his] life" since he had witnessed police shoot Britt "for no reason." (Montford Aff., ¶ 4, Montford Depo., p. 28). Montford finally decided to come forward with the information "[b]ecause the case is now in Federal Court." (Montford Aff., ¶ 5).

The Court will not weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party. *Id.*

The defense of qualified immunity protects government officials performing discretionary functions from liability "where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Gold v. City of Miami*, 121 F.3d 1442, 1445 (11th Cir. 1997)(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). As long as the official's conduct is not unlawful, the doctrine of qualified immunity exempts government officials from suits to enable them to perform their responsibilities without threats of liability. *Hutton v. Strickland*, 919 F.2d 1531, 1536 (11th Cir. 1990) (citations omitted). Qualified immunity is intended to protect "all but the plainly incompetent or those who knowingly violate the law." *McCoy v. Webster*, 47 F.3d 404, 407 (11th Cir. 1995)(quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

To determine the propriety of qualified immunity, the government official's conduct is evaluated under an "objective legal reasonableness" standard. *Koch v. Rugg*, 221 F.3d 1283, 1295 (11th Cir. 2000) (citations omitted). The official's subjective intent is irrelevant to the inquiry. *Id.* Under the "objective legal reasonableness" standard, a government official performing discretionary functions is protected if "a reasonable official could have believed his or her conduct to be lawful in light of clearly established law and the information possessed by the official at the time the conduct occurred." *Hardin v. Hayes*, 957 F.2d 845, 848 (11th Cir. 1992).

The Supreme Court has established a two-part test to determine the applicability of qualified

6

immunity. *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11ᵗʰ Cir. 2003). First, the Court must determine whether the Plaintiff has alleged the deprivation of a constitutional right. *Id.* The second step in the analysis is to determine whether Plaintiff's right was clearly established at the time the alleged violation occurred. *Id.*

A right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). In *Hope*, the Supreme Court articulated the standard for determining whether the law is "clearly established":

> For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; [ ] but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Hope*, 536 U.S. at 739 (citations and quotations omitted).[4]

### Discussion

1.   *Qualified Immunity*

It is undisputed that Burdette was acting within the scope of his discretionary authority when he shot Britt. Plaintiff has alleged the deprivation of a constitutionally protected right, namely the right to be free from unreasonable searches and seizures, which includes the right to be free from excessive force. *See Mercado v. City of Orlando*, 407 F.3d 1152, 1156-57 (11ᵗʰ Cir. 2005) (citing *Graham v. Connor*, 490 U.S. 386, 394-95 (1989)). Accordingly, the only issue is whether that right

---

[4] In this Circuit, the law may be clearly established for qualified immunity purposes only by opinions from the United States Supreme Court, the Eleventh Circuit Court of Appeal, or the highest court of the state in whose law is at issue. *Hamilton v. Cannon*, 80 F.3d 1525, 1531-31 n.7 (11ᵗʰ Cir. 1996).

was clearly established in light of the facts when viewed in the light most favorable to Plaintiff, the non-moving party.

Determining whether the force used was reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests at stake. *Tennessee v. Garner*, 471 U.S. 1, 8 (1985); *Crosby v. Paulk*, 187 F.3d 1339, 1351 (11th Cir.1999). Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," *Bell v. Wolfish*, 41 U.S. 520, 559 (1979), "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight. "*Graham*, 490 U.S. at 396 (emphasis added). Therefore, "[u]se of force must be judged on a case-by-case basis 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir.1993) (quoting *Graham* 490 U.S. at 396).

"[A] plaintiff facing qualified immunity must produce evidence that would allow a fact-finder to find that no reasonable person in the defendant's position could have thought the facts were such that they justified defendant's acts." *Wood v. City of Lakeland, FL,* 203 F.3d 1288, 1292 (11th Cir. 2000) (citations omitted). Accordingly, in order to avoid summary judgment on the basis of qualified immunity in this case, Plaintiff must produce evidence that would allow a fact-finder to conclude a reasonable person in Burdette's position could not have believed deadly force was necessary to prevent imminent death or great bodily harm to Burdette or others. *See Wood*, 203 F.3d

at 1292. Based on the record evidence, a question of material fact exists, namely whether Britt posed a threat of imminent death or great bodily harm to Burdette. Since these critical facts are in dispute, summary judgment on the basis of qualified immunity is not appropriate. *See Arrington v. Jenkins*, 2006 WL 1914597, *1 (11th Cir. 2006) (affirming district court's denial of qualified immunity where issues of material fact were disputed).

Viewing the evidence in the light most favorable to Plaintiff, Burdette used deadly force on Britt even though Britt was not identified as a suspect of a crime, was not actively resisting arrest or attempting to evade arrest by flight. According to Plaintiff's version of the facts, Burdette exercised deadly force because Britt appeared suddenly at the doorway of the shed holding a baseball bat at his side, but did not make an aggressive move toward Burdette.

While the use of deadly force has been found constitutional "where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others . . .," it is clearly established that using deadly force against a non-dangerous suspect is unconstitutional. *See Garner*, 471 U.S. at 11. Montford's testimony regarding Britt's actions right before he was shot cannot be reconciled with Burdette and Matheny's version of the facts. Burdette and Matheny contend Britt moved toward them aggressively with the bat raised above his head as if he was about to strike Burdette. Montford testified that the bat was always at Britt's side and that he "did not make any move toward the officers nor did he ever raise the bat up away from his leg . . . [or] make any type of threatening gesture." (Montford Aff., ¶ 3; Montford Depo., p. 49).

If Montford's testimony is believed, namely that Britt was not acting aggressivly or posing a threat of imminent death or serious bodily injury to Burdette, a reasonable jury could conclude that deadly force was excessive and in violation of the Fourth Amendment. *See Garner*, 471 U.S. 1, 11

9

(1985) ("[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so . . ."); *Graham*, 490 U.S. at 396. The facts as depicted by Montford stand in clear contrast to the facts of cases where courts have held the officer acted reasonably in exercising deadly force. *See e.g. Wood*, 203 F.3d at 1292-93 (officer entitled to qualified immunity where he exercised deadly force against an individual who was known to be dangerous to himself and who was armed with a knife; officer used deadly force only after he "repeatedly" told the individual to drop his weapon, but the individual failed to do so and made a quick movement toward the officer while he had the knife in hand); *O'Neal v. DeKalb County, GA*, 850 F.2d 653, 657-58 (11th Cir. 1988) (officers entitled to qualified immunity where they used deadly force to protect themselves and others from individual armed and known to have stabbed multiple people, which was evidenced from blood and injured bodies on the floor when the officers arrived on the scene).

In sum, this Court cannot determine whether Burdette is entitled to qualified immunity because to do so would require the Court to make credibility determinations and to weigh the evidence. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 150-151 (2000 ). Accordingly, at this stage of the proceedings, Burdette is not entitled to dismissal based on qualified immunity.

2.    *Vicarious Liability of Sheriff Judd*

For the reasons discussed, this Court cannot conclude that Burdette justifiably and reasonably used deadly force under the circumstances. Accordingly, this Court cannot conclude that Burdette was not negligent and that Sheriff Judd should not be held vicariously liable. Summary judgment

on this claim, therefore, is not appropriate. Accordingly, it is

      **ORDERED AND ADJUDGED** that Defendants' Motion for Summary Judgment (Dkt. 33)

is **DENIED**.

      **DONE AND ORDERED** in chambers this 27th day of September, 2006.

                        **JAMES D. WHITTEMORE**
                        **United States District Judge**

Copies to:
Counsel of Record

11